IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

GANZEL V. GANZEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BERNICE E. GANZEL, BY AND THROUGH BEVERLY A. YORK,
HER CONSERVATOR AND GUARDIAN, APPELLEE,

V.

NORMAN L. GANZEL, INDIVIDUALLY AND AS TRUSTEE, APPELLANT.

Filed June 27, 2017.    No. A-16-620.

Appeal from the District Court for Gage County: PAUL W. KORSLUND, Judge. Affirmed.

Lyle J. Koenig, of Koenig Law Firm, for appellant.

Jeffrey B. Hubka, of Hubka & Hubka, for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

I. INTRODUCTION

Bernice E. Ganzel, by and through Beverly A. York, her conservator and guardian, filed suit in the district court for Gage County against Norman L. Ganzel, individually and as trustee, alleging that Norman, while acting as Bernice's attorney in fact, misappropriated certain funds belonging to Bernice. Following a bench trial, the court dismissed Bernice's claim for attorney fees, but the court found that Norman had misappropriated Bernice's funds for his own benefit and entered judgment in Bernice's favor. Finding no error, we affirm.

## II. BACKGROUND

### 1. PARTIES

Bernice and Orval Ganzel were the parents of Darwin Ganzel, Beverly, and Norman. Orval passed away on October 2, 2008. At the time of trial, Bernice was 99 years old and lived in Beatrice, Nebraska. Norman and Darwin both live in Indiana. During her "working life," Beverly lived in Kansas, but she has lived in Beatrice since October 2009.

### 2. POWER OF ATTORNEY

In July 1995, Bernice executed a durable power of attorney naming Norman as her attorney in fact. Norman did not begin using the power of attorney until around the time of his father's death in October 2008, after which time he used it to conduct business for and on behalf of Bernice.

On August 22, 2014, Beverly was appointed as Bernice's guardian and conservator, and letters of guardianship and conservatorship were issued by the Gage County Court on October 6. After her appointment as Bernice's guardian and conservator, Beverly discovered that there were funds missing from Bernice's accounts. On November 10, acting as guardian and conservator, Beverly revoked Norman's power of attorney.

### 3. PLEADINGS

On November 26, 2016, Beverly filed suit in the district court on behalf of Bernice. Bernice sought an accounting, a judgment in an amount equal to any of her funds or property misappropriated by Norman for his own use plus interest, an order setting aside the conveyance of certain real property, and attorney fees.

Bernice's first cause of action for an accounting was dismissed on Bernice's motion prior to trial, and her second cause of action was amended to remove any reference to the accounting. Her third cause of action, seeking to set aside the conveyance of certain real property, was resolved by the district court's previous grant of partial summary judgment in her favor.

### 4. TRIAL

Bernice's amended second cause of action, seeking damages for misappropriated funds, and her fourth cause of action, seeking attorney fees, were tried to the district court on April 1 and 19, 2016. Prior to the start of evidence, Norman made an oral motion to dismiss these causes of action, which the court took under advisement. The court then heard testimony from Beverly, Darwin, Norman and his wife, and two bank employees and received numerous documentary exhibits into evidence.

#### (a) Cashier's Checks

The evidence at trial shows that in September and October 2008, four cashier's checks were issued withdrawing funds from Bernice's account at Pinnacle Bank in Beatrice. Three of the checks (for amounts of $100,547.25, $57,157.99, and $2,294.75) are dated October 7, 2008 and were made payable, respectively to "ORVAL OR BERNICE GANZEL OR NORMAN GANZEL," "ORVAL OR BERNICE GANZEL," and "ORVAL OR BENICE GANZEL OR DARWIN GANZEL." Copies of the front and back of these checks as well as associated

transaction forms were received into evidence as exhibits 19-21. In the endorsement area on the back of these checks, they all bear a signed notation of "Bernice Ganzel Norman L. Ganzel P.O.A." The transaction forms also all bear a signed notation of "Norman L. Ganzel P.O.A." The $100,547.26 check and the $57,157.99 check were both canceled through Forum Credit Union in Indianapolis, Indiana, although for reasons not completely explained in the record, the cancellation stamp on the back of these two checks is dated October 2. One of the Pinnacle Bank employees testified that the cancellation appeared "peculiar" to her because there was "too much space between the two [representing the day] and the 2008," and she noted that the two representing the day appeared fainter than the rest of the numbers in the cancellation date. She also testified that her experience in "dealing with bank dates" had been "that there would typically be a zero before the two, in this case of a single numeral date." Norman testified that he had had an account at Forum Credit Union and that Bernice had never had an account there. Exhibit 21, the check for $2,294.75, does not appear to have been deposited in a bank account, bearing only a handwritten numeric notation in the cancellation area on its back, but as noted above, appears to have been endorsed by Norman. Beverly testified that she recognized Norman's signature in the endorsement area of these checks. She testified that exhibits 19-21 were exactly as appeared when she received them from Pinnacle Bank and that she did not alter them in any way.

The fourth Pinnacle Bank cashier's check for $50,000 and corresponding transaction form, admitted into evidence as exhibit 22, was issued on September 29, 2008, payable to "NORMAN GANZEL." Exhibit 22 shows that the $50,000 check was cancelled on October 9. In the endorsement area on the back it bears a signed notation of "Norman Ganzel." Exhibit 22 was cancelled through Community Bank in Indiana on October 9, and the cancellation shows an account number corresponding to the Community Bank account, which we describe below. The transaction form bears a signed notation of "Norman L. Ganzel P.O.A." As with the other cashier's checks, Beverly testified that she recognized Norman's signature on the endorsement.

Two Pinnacle Bank employees testified that they specifically remember Norman receiving exhibits 19-21, which were the three cashier's checks from Pinnacle Bank dated October 7, 2008 and totaling $160,000. Exhibits 19 and 20 were for the closing of certificates of deposit, and the checks were made payable to the order of the individuals in whose names the certificates were titled. The source of the funds in exhibit 21 was "a debit to a checking account." The Pinnacle Bank employees also testified that in releasing any cashier's check to a person acting pursuant to a power of attorney, they would have verified the identity of the person either by personal knowledge or by photo identification. One of the employees verified that exhibits 19-21, including the cancellations on the back, were true and accurate copies of what appeared in the bank's records.

Norman denied ever receiving any of the cashier's checks, including exhibits 19-21 which were issued on October 7, 2008 the day after Orval's funeral. He also denied that he endorsed any of the cashier's checks. Orval died on October 2, which was a Thursday. His funeral was Monday, October 6. The record shows that Norman was in Nebraska on October 2 when Orval died. There was conflicting evidence with respect to when Norman returned to Indiana following the funeral. Norman and his wife both testified that they left Beatrice at about 6 a.m. on October 7 to return to Indiana. They denied stopping at Pinnacle Bank in Beatrice on October 7. Darwin testified that he left to return to Indiana the day after the funeral and that when he left, Norman was still in

Nebraska. According to Darwin, Norman told him he was going to remain in Nebraska helping Bernice for about a week. On the first day of trial, Beverly testified that after the funeral, she "returned to the home here in Beatrice" with her family and brothers, where they ate dinner together and spent the night. She did not recall that either Norman or Darwin left town on October 6. She testified that Norman was "possibly" in Indiana on October 7, that she believed he left Nebraska on the morning of October 7, and that he would usually leave early in the morning. Beverly testified again on the second day of trial. At that time, she testified that she did not believe Norman returned to Indiana until Thursday or Friday, October 9 or 10.

### (b) Community Bank Account

After his father's death, Norman opened a checking account at Community Bank in Indiana in both his and Bernice's names. Bernice's social security and pension checks were deposited every month in the account. The funds in the account were used for both Bernice's and Norman's personal expenses. Norman testified that the Community Bank checking account was the only account he used for Bernice's income or expenses. A complete record of the Community Bank statements from October 2008 through the closing of the account in February 2015 was entered into evidence.

### (c) Deposits

The statements show that on October 9, 2008, $35,000 was deposited into the Community Bank account. The deposit ticket for the transaction shows that the amount tendered was actually $50,000 and that "Norman Ganzel" was given $15,000 in cash. Norman denied using the $50,000 Pinnacle Bank account cashier's check (exhibit 22) to open the Community Bank account. He testified that he was "under the assumption" the money came from his savings account although he was unable to "pinpoint the institution it came out of" and doubted he had any records available to show where the money came from. He subsequently testified that he was "almost positive" the $50,000 came from a buyout related to his employment with a railroad and that he deposited $35,000 and kept $15,000 in cash.

The next amount deposited into the Community Bank account was $30,000 on October 20, 2008. The deposit ticket for that transaction shows that the amount tendered was $40,000 and that after depositing $30,000, Norman received $10,000 in cash. A statement for a checking account Bernice had at Wells Fargo, shows that a withdrawal of $40,000 was made from the Wells Fargo account on October 15. Norman claimed that the $30,000 deposit came from his own money rather than the Wells Fargo withdrawal. He testified that this deposit possibly also represented money from the railroad, but he did not have any transaction receipt, cancelled check, or other proof that it was his money.

On November 7, 2008, Norman deposited $53,674 into the Community Bank account. The bank statement identifies this transaction with the description "AVLIC CASH CON PREM OR LN." Beverly testified that the letters "AVLIC" stand for "Amerit[a]s Variable License [sic] Insurance Company," a company with which her parents had business. Bernice's 2008 income tax return includes a "Form 1099-R" from Ameritas Life, which shows "Gross distribution" of $55,205, "federal income tax withheld" of $1,021 and "State tax withheld" of $510. If the gross

proceeds from Ameritas Life are reduced by the total federal and state income tax withheld, the net benefit of this distribution, $53,674, corresponds to the amount of the November 7 deposit at Community Bank. When asked if the $53,674 deposit represented an annuity from his mother's Ameritas Life insurance policy, Norman testified that he did not "know anything about that." He did not know what "AVLIC" stood for, and when asked if he believed the deposit came from his own money, he testified, "I have no idea about that money."

The parties' stipulated that between November 2008 and February 2014, Norman deposited $893 of his own money in the Community Bank account: $3 in February 2011, $90 in January 2013, and $800 in February 2014.

### (d) Withdrawals

The record shows eight electronic debits from the Community Bank account in favor of Citimortgage, Inc., totaling $5,493.78. Beverly testified that she was not aware of Bernice ever owing money to Citimortgage, and she does not pay any mortgage on Bernice's house. Neither Beverly, nor Norman when he had the power of attorney, has ever paid a mortgage payment for Bernice's house. Norman confirmed that Citimortgage used to be his mortgage company and testified that he owed money to Citimortgage "[y]ears ago." Norman did not believe Bernice ever owed money to Citimortgage.

The district court received into evidence exhibit 15, which includes copies of "image statements" showing checks drawn on the Community Bank account between October 2008 and November 2013. Some of the check images in exhibit 15 are circled, and the first three pages of the exhibit are a spreadsheet compilation showing the details of the circled checks, which totaled $18,330.99. The parties stipulated that the compilation was an aid to the court and that the checks referenced by the compilation were not for Bernice's benefit. The court also received exhibit 18, which included copies of image statements showing transfers and cash advances from the Community Bank account occurring between October 2008 and May 2013. The compilation page for exhibit 18 shows transactions totaling $87,900. The parties also stipulated that the transactions represented by exhibit 18 were not for Bernice's benefit.

### (e) Ford Freestyle Automobile

At the time of Orval's death, he and Bernice owned a 2006 Ford Freestyle automobile. Norman took possession of the vehicle at some point although he was unsure of the date. Norman no longer had the vehicle at the time of trial, claiming that it "went bad." Norman testified that he donated the car to charity, that he received a tax credit of about $300, and that he then gave that amount to Bernice. Norman testified that he had no idea of the value of the car when he donated it, stating that the motor was bad, the transmission was going bad, and that it was "beyond repair." Norman was vague about the form of the credit, initially stating that he "asked the tax man" because he wanted to know how much to pay Bernice. He later testified that he received a check from a radio station or an auction company. Norman did not have a copy of the check or any receipt for the transaction. Norman denied selling the car to someone else. Darwin testified that Norman told him at some point that he sold the vehicle to his wife's friend for $14,500. Norman's wife

testified that her friend drives a vehicle that is the same color as Bernice's was and is very similar to a Ford Freestyle, but she denied any knowledge of where her friend obtained the vehicle.

### (f) Exhibit 38

Norman offered exhibit 38, which is a multi-page handwritten document created by him that he described as "an itemized account of what I kept [as a] record of mom's money and mine." According to Norman, he compiled exhibit 38 from a ledger that he kept to document the amounts of his own money that he expended on behalf of his mother. Bernice's attorney objected to the offer of exhibit 38 because it had not been disclosed at the time of the pretrial conference. In response, Norman's attorney stated that he had not been aware of the existence of exhibit 38 at that time and that he had disclosed it to Bernice's attorney as soon as he became aware of it, which was one week prior to the start of trial. After conducting a voir dire examination of Norman, Bernice's attorney objected further that exhibit 38 was not the best evidence "[i]f there is another ledger somewhere" and, based on Norman's previous testimony that he "ha[d] no prior information available," also objected on the basis of foundation. Norman's attorney argued that the original ledger could not be entered into evidence because it contained trial notes which would need to be redacted and made an offer of proof that exhibit 38 represented Norman's expenses in pursuing his power of attorney duties for his mother and that it shows he paid $59,000 of his own money for Bernice's care over and above the amount of money that he took in. The district court sustained Bernice's objection on the basis that exhibit 38 was not the best evidence, and, although the record is somewhat confusing, it appears that the court also sustained the objection based on foundation and the fact that the exhibit was not disclosed at pretrial, and noted that the exhibit probably contained hearsay.

### (g) Norman's Memory

Norman and his wife both testified that he had memory problems and was taking medication for the "onset of Alzheimer's." Beverly testified that prior to filing the petition for guardianship of her mother, she had contact and a sibling relationship with Norman. She testified that during that time, he never indicated to her that he was suffering from anything like Alzheimer's.

## 5. JUDGMENT

On May 31, 2016, the district court entered an order finding in favor of Bernice and against Norman. The court first ruled on Norman's motion to dismiss, denying the motion with respect to Bernice's second cause of action, but the court granted the motion as to Bernice's fourth cause of action and accordingly dismissed her claim for attorney fees.

The district court found that all three of the initial deposits into the Community Bank account in October and November 2008 could be traced specifically to Bernice's funds and were clearly derived from funds owned solely by Bernice. The court noted that other than deposits representing Bernice's social security and pension checks, and tax refunds, the three initial deposits were "essentially the only deposits" to the account. The court stated, "Although Norman testified that he put substantial amounts of his own money into this account, that is not shown in the bank

statements or the stipulation of the parties that Norman deposited only $893 during that almost six-year period." The court further found:

> Norman's testimony that he put his own money into this account is simply not borne out by the documentary evidence nor is it borne out by his own testimony. He said that he may have had 'arbitration checks' from his retirement; however, there is evidence in the record that he retired from the railroad in early 2008 and his arbitration checks would have come prior to his retirement. The fact is that except for $893.00, all of the money in the Community Bank checking account was Bernice's property and therefore the checks shown in Exhibit 15 and the cash and money transfers shown in Exhibit 18 were taken by Norman for his own use and not for the benefit of Bernice and should be repaid.

> A portion of the $50,000.00 check shown in Exhibit 22 was deposited in the Community Bank checking account, and a portion of the $40,000 check [Wells Fargo withdrawal] . . . was also deposited in the Community Bank checking account. Beverly, on behalf of Bernice, is not asking for repayment of the $50,000 and $40,000 checks, but rather repayment of the cash taken from these checks ($15,000 and $10,000), and repayment of the checks, cash advances and transfers to Norman or for his benefit, actually taken from the Community Bank checking account by Norman.

With respect to exhibits 19-21, three of the cashier's checks drawn on Bernice's Pinnacle Bank account, the district court found that it was "just not creditable that anyone other than Norman received these checks." The court found the evidence showed that these checks were "specifically delivered to Norman and deposited into a bank in which Norman conducted business," leading "to the conclusion that these funds were misappropriated." The court found Norman's testimony that he never saw these checks and that "the endorsement in his name on the back as Power of Attorney is not his signature is clearly not credible." The court stated that even without Beverly's testimony that she recognized Norman's signature, there was "very persuasive evidence" that Norman took the checks and that they were not used for Bernice's benefit. The court stated, "If there was some mistake or forgery, as Norman implies, the fact remains that these cashier's checks were prepared in Beatrice, Nebraska and they were cancelled by a financial institution in Indiana," which would mean that "whoever stole, misappropriated or forged these checks without Norman's knowledge also returned to Indiana to do his banking." The court found that Bernice was entitled to recover the proceeds of all of the three checks totaling $160,000.

The district court also addressed the Citimortgage payments made from the Community Bank account and the Ford Freestyle vehicle. With respect to the eight Citimortgage deductions, the court found that they were clearly not made for Bernice's benefit, could only reasonably be explained as having been made for Norman's mortgage payments, and should be repaid to Bernice. With respect to the Ford Freestyle, the court found it unlikely that Norman donated the car and that even if he had, donating a "fairly new and valuable vehicle for only nominal consideration" would be a breach of Norman's fiduciary duty to his mother. The court found "no showing of where any of this money [received for the vehicle] went" and that Norman should repay Bernice $14,500, the sale price of the vehicle.

The district court further discussed Norman's claims of memory and medical problems and addressed his credibility. The court noted that Norman offered no medical evidence and found that in 2008 and 2009 when Norman was conducting business for Bernice "he knew what he was doing." The court also found that while Bernice's claims were supported by both testimony and unrefuted documentary evidence, Norman failed to provide any receipts, deposit tickets, cancelled checks, bank statements, or any other type of documentary evidence to support his claims. The court found Norman's explanations proffered at trial "not persuasive" and found him "generally not credible." The court also noted Norman's "very cavalier attitude toward his mother's missing funds."

The district court then discussed certain case law applicable to "interested transaction[s]" by attorneys in fact. The court concluded that not only did Norman transfer Bernice's funds into the joint account, but he personally received substantial financial benefit at the expense of his mother. The court stated, "Although benefit to the agent without consent and notice is all that is necessary for recovery, in this case Norman's bad faith is obvious," constituting a "profound" breach of fiduciary duty.

The district court ordered that Beverly, on behalf of Bernice, should recover the following from Norman:

| | |
|---|---|
| Checks written on Community Bank Account | $ 18,330.99 |
| Transfers and cash withdrawals | 87,900.00 |
| Cash from Wells Fargo withdrawal | 10,000.00 |
| Pinnacle Bank cashier's checks dated 10/07 | 160,000.00 |
| Citimortgage payments | 5,493.78 |
| 2006 Ford Freestyle vehicle | 14,500.00 |
| TOTAL | $296,224.77 |

Accordingly, the court entered judgment against Norman in the amount of $296,224.77 plus interest, and taxed costs to Norman.

### III. ASSIGNMENTS OF ERROR

Norman asserts, reordered, that the district court erred in (1) refusing to admit exhibit 38, (2) finding that he misappropriated funds from Bernice, and (3) awarding damages of $296,224.97.

### IV. STANDARD OF REVIEW

The nature of an action, whether legal or equitable, is determinable from its main object, as disclosed by the averments of the pleadings and the relief sought. *Elting v. Elting*, 288 Neb. 404, 849 N.W.2d 444 (2014). In her second cause of action, Bernice sought a money judgment. A suit where only a money judgment is sought is an action at law. *Jim's Dodge Country v. LeGrande Excavating*, 6 Neb. App. 719, 575 N.W.2d 890 (1998). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Donut Holdings v. Risberg*, 294 Neb. 861, 885 N.W.2d 670 (2016). An appellate court independently reviews questions of law decided by a lower court. *Id.*

# V. ANALYSIS

## 1. ADMISSION OF EXHIBIT 38

Norman asserts that the district court erred in refusing to admit exhibit 38. The court sustained Bernice's objection that exhibit 38 was not the best evidence. Although the record is somewhat confusing, the court appears to also have sustained the objection on the grounds of hearsay and foundation and due to the fact that the exhibit was not disclosed at pretrial.

Neb. Rev. Stat. § 27-1002 (Reissue 2016) states, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress or of the Legislature of the State of Nebraska or by other rules adopted by the Supreme Court of Nebraska." "The purpose of Rule 1002 is the prevention of fraud, inaccuracy, mistake, or mistransmission of critical facts contained in a writing, recording, or photograph when its contents are an issue in a proceeding." *Equitable Life v. Starr*, 241 Neb. 609, 615, 489 N.W.2d 857, 862 (1992).

Norman argues that exhibit 38 is simply a summary he prepared of payments he made on behalf of Bernice from a ledger that he himself prepared. He argues that it is itself an original document prepared from the ledger, which was not produced because it contained confidential work product that would have needed to be redacted before being introduced into evidence. Norman does not explain why a redacted copy of the original ledger was not prepared, nor does he present any arguments with respect to the other bases on which Bernice's objection was sustained, other than to note that his counsel disclosed the exhibit to Bernice's counsel as soon as he became aware of its existence, which was one week before the first trial date. Norman also argues that the contents of exhibit 38 were not at issue during the proceeding, but that the exhibit "merely illustrates in more detail [Norman's] testimony that he expended more money than he obtained from Bernice." Brief for appellant at 16. Norman did testify that he expended at least $59,000 of his own money on Bernice's care over and above the amount that came in from other sources. To the extent that exhibit 38 "merely illustrate[d] in more detail" this testimony by Norman, it was cumulative evidence. We find no error in the district court's exclusion of exhibit 38.

## 2. MISAPPROPRIATION OF FUNDS

Norman asserts that the district court erred in finding that he misappropriated funds from Bernice.

A power of attorney is an instrument in writing authorizing another to act as one's agent. *Archbold v. Reifenrath*, 274 Neb. 894, 744 N.W.2d 701 (2008). An agent holding a power of attorney is termed an "attorney in fact" as distinguished from an attorney at law. *Id.* An agency is a fiduciary relationship resulting from one person's manifested consent that another may act on behalf and subject to the control of the person manifesting such consent and, further, resulting from another's consent to so act. *Id.* An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal, to act solely for the principal's benefit in all matters connected with the agency, and to adhere faithfully to the instructions of the principal, even at the expense of the agent's own interest. *Id.* Because of the

agency relationship created by a power of attorney, the authority and duties of an attorney in fact are governed by the principles of the law of agency, including the prohibition against an agent profiting in transactions in which the agent represents the principal. *Id.*

No gift may be made by an attorney in fact to himself or herself unless the power to make such a gift is expressly granted in the instrument and there is shown a clear intent on the part of the principal to make such a gift. *Crosby v. Luehrs*, 266 Neb. 827, 669 N.W.2d 635 (2003). Absent express intention, an agent may not utilize his or her position for the agent's or a third party's benefit in a substantially gratuitous transfer. *Id.* An attorney in fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney in fact's engaging in an interested transaction after full disclosure. *Id.*

Norman argues that the evidence is insufficient to prove he made a gift to himself using funds from Bernice that had been deposited into the Community Bank account in Indiana. He focuses primarily on the conflicting evidence with respect to when he left Nebraska following his father's funeral and details with respect to the cashier's checks themselves. Norman essentially asks us to resolve conflicts in the evidence, determine the weight of certain evidence, and the credibility of witnesses, all things which are the province of the trial court. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016). The court clearly made credibility determinations with respect to Norman's testimony, and we defer to those determinations.

Norman also argues that Beverly should be held to her testimony on the first day of trial when she testified that Norman left Nebraska on the morning of October 7, 2008 as opposed to later that week as she testified on the second day of trial. Where a party without reasonable explanation testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of pending litigation, such evidence is discredited as a matter of law and should be disregarded. *Riggs v. Nickel*, 281 Neb. 249, 796 N.W.2d 181 (2011). In applying this rule, the important considerations are that the testimony pertains to a vital point, that it is clearly apparent the party has made the change to meet the exigencies of the pending case, and that there is no rational or sufficient explanation for the change in testimony. *Id.* The rule that a party who changes his or her testimony during litigation is bound by his or her earlier statements does not apply when the party's earlier statements are ambiguous. *Aguallo v. City of Scottsbluff*, 267 Neb. 801, 678 N.W.2d 82 (2004). A close reading of the record shows at least some ambiguity in Beverly's statements on the first day of trial with respect to when Norman left Nebraska. Also, Beverly explained on the second day that she had had more time to reflect on the events surrounding Orval's funeral. Regardless, even if we were to ignore Beverly's testimony from the second day of trial on this issue, there is still sufficient evidence to support the district court's findings.

The record supports the district court's conclusion that Norman received substantial financial benefit at Bernice's expense. He took funds from her bank in Nebraska and deposited them into his own account and made expenditures from the joint account for his own benefit. He also took funds belonging to Bernice and deposited them into his own account or did not deposit them into the Community Bank account. The evidence supports a conclusion that Norman wrote

checks totaling $18,330.99 and made transfers and cash withdrawals of $87,900 from the Community Bank account that were not for Bernice's benefit; that he took $10,000 cash from Bernice's Wells Fargo account; that he received cashier's checks totaling $160,000 which he either deposited in his own account or did not deposit in the Community Bank account; that he made mortgage payments totaling $5,493.78 that were not for Bernice's benefit; and that he took her vehicle and sold it for $14,500. This assignment of error is without merit.

### 3. AMOUNT OF DAMAGES

Norman asserts that the district court erred in awarding damages of $296,224.97. Norman admits there are documents showing he wrote some checks on the Community Bank account for his own purposes, but argues that he deposited his own money into the account as well and also experienced a deficit of $59,000 over and above the amount of money deposited by Bernice in the Community Bank account. Again, he primarily attacks the weight and credibility of Bernice's evidence, and as stated above, we defer to the court's determinations in that regard. The court specifically found that Norman's testimony that he put his own money into the Community Bank account was "not borne out by the documentary evidence nor . . . by his own testimony," which the court found "generally not credible."

As set forth in greater detail above, the evidence supports a conclusion that Norman took money or property belonging to Bernice and made certain expenditures that were not for her benefit, which amounts totaled $296,224.77. We find no error in the court's award of damages totaling $296,224.77. This assignment of error is without merit.

### VI. CONCLUSION

The district court did not err in refusing to admit exhibit 38, in finding that Norman misappropriated funds from Bernice, and in awarding damages to Bernice of $296,224.97.

AFFIRMED.